# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

JERRY BOWENS,

              Plaintiff,

 v.

JOSEPH T. SMITH,            9:11-CV-784
                (GLS/ATB),
              Defendant.

JERRY BOWENS, Plaintiff, *pro se*
RICHARD LOMBARDO, AAG, for the Defendants

ANDREW T. BAXTER, U.S. MAGISTRATE JUDGE

## REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

In this amended civil rights complaint, plaintiff alleges that defendants improperly retained plaintiff in administrative segregation at Shawangunk Correctional Facility without due process[1] for "over" five hundred and seventy five days. (Amended Complaint ("AC") ¶ 9) (Dkt. No. 8). Plaintiff claims that this lengthy stay in administrative segregation ("Ad Seg") violated his First, Fourth, and Eighth Amendment rights, and he also claims that he has been denied Equal Protection. (AC at pp.24-27).[2] Plaintiff seeks injunctive and substantial monetary relief.

---

[1] Plaintiff asserts procedural and substantive due process violations.

[2] These pages refer to the pages assigned to Dkt. No. 8 by the court's electronic case management system ("CM/ECF"). There are two sets of numbers at the top of many of the pages of the amended complaint. When plaintiff filed his amended complaint, he re-filed his original complaint with additional pages. The original complaint still has the pages that were assigned by CM/ECF to Dkt. No. 1. Thus, I will refer to those pages that were assigned by CM/ECF when plaintiff filed his

On June 26, 2012, defendants made a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). (Dkt. No. 19). On December 7, 2012, I issued a report, recommending dismissal of all defendants except Superintendent Smith. (Dkt. No. 22). I also recommended that the defendants' motion be denied in part, and that the amended complaint proceed only as to plaintiff's procedural due process and religion claims against defendant Smith. (Dkt. No. 22 at 23-24). On January 8, 2013, Chief Judge Sharpe adopted my Report-Recommendation. (Dkt. No. 23).

The parties subsequently exchanged mandatory disclosures,[3] and plaintiff was deposed on December 6, 2013. (Dkt. Nos. 27, 33, 48-6). On April 1, 2014, the parties stipulated to a partial discontinuance of the remaining issues. (Dkt. No. 45). The plaintiff agreed to dismiss his claim that defendant Smith violated plaintiff's first amendment or equal protection rights by not permitting plaintiff to have access to a spiritual leader while plaintiff was confined to Ad Seg. (Dkt. No. 45 at 2).

Presently before the court is defendant's motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 48). Plaintiff has not responded to the motion.

I. **Summary Judgment**

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a

---

amended complaint (Dkt. No. 8).

[3] On June 7, 2013, defendant Smith made a motion to dismiss for lack of prosecution based upon plaintiff's failure to comply with the mandatory disclosure requirements. (Dkt. No. 30). This court held a telephone conference and subsequently ordered plaintiff to serve his mandatory disclosures by July 5, 2013. (Dkt. No. 32). Plaintiff complied with the court's order on June 28, 2013. (Dkt. No. 33).

2

matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin v. Goord*, 467 F.3d at 272.

## II. Facts

### A. Complaint

Plaintiff alleges that when he was incarcerated at Downstate Correctional Facility

3

("Downstate") in 2009,[4] he was allowed to be in General Population. (AC ¶ 1). Plaintiff states that he was in General Population at Downstate for approximately one and one half months before he was transferred to Shawangunk Correctional Facility ("Shawangunk"). Upon his transfer to Shawangunk, he was told that he would be placed in Ad Seg. Plaintiff claims that although he had a hearing prior to Ad Seg placement, he was not allowed to introduce any exhibits or letters of reference in an effort to prove that he should not be placed in restrictive confinement. (AC ¶¶ 6, 8).

Plaintiff states that he maintained "an outstanding disciplinary record," and he was given no reason for his continued confinement in Ad Seg. (AC ¶¶ 8-9). However, plaintiff also states that he was placed in Ad Seg "as a result of the people plaintiff <u>knew</u> or <u>knows</u> on the outside . . . ." (AC ¶ 10) (emphasis in original). Plaintiff also states that the defendants' belief that plaintiff is "a threat to its [sic] security or other inmates" is "insane" and "extreme." (*Id.*)

Plaintiff states that his conditions in Ad Seg were unconstitutionally harsh. He was denied use of the telephone and denied access to his "spiritual leader" when plaintiff's father died. Plaintiff states that his right to visitation, association, and possession of personal property were limited, his commissary and package privileges were limited, and he was denied the ability to attend congregate religious services. (AC ¶¶ 12-13 & First Cause of Action). Plaintiff alleges that he had the same restrictions placed upon him as inmates who were in the Special Housing Unit ("SHU") for

---

[4] Plaintiff also alleges that he was sent to Downstate in 2011, and was placed in General Population even though he had been in Ad Seg at Shawangunk since his transfer there in 2010. (AC ¶ 2).

4

disciplinary violations. He was shackled when he was escorted to the showers, and had no contact with his "peers."[5] (AC ¶ 14).

## B. Defense Materials

Defendants have submitted a substantial number of exhibits,[6] including the audiotape of plaintiff's Ad Seg hearing, conducted on December 30, 2009 and January 8, 2010 and plaintiff's December 6, 2013 deposition in this case. (Dkt. Nos. 48-6 (Ex. A) (Pl.'s Dep.), 48-15 & 51 (audiotape)). Rather than detail all the defendants' facts at the outset, I will discuss the evidence as I analyze the issues presented by defendants' motion.

## III. Due Process

### A. Legal Standards

In order to begin a due process analysis, the court determines whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges and then determines whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001); *Bedoya v. Coughlin*, 91 F.3d 349, 351 (2d Cir. 1996). In *Sandin v. Conner*, the Supreme Court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by

---

[5] As stated above, the only remaining claim related to the privileges themselves is that plaintiff was unable to attend congregate services.

[6] (Dkt. No. 48-6 - 48-66, Exs. A-III).

the Due Process Clause of its own force . . . , nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995).

The Second Circuit has explicitly avoided a bright line rule that a certain period of confinement in a segregated housing unit automatically gives rise to due process protection. *See Sims v. Artuz*, 230 F.3d 14, 23 (2d Cir. 2000); *Colon v. Howard*, 215 F.3d 227, 234 (2d Cir. 2000). Instead, cases in this circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed. *Palmer v. Richards*, 364 F.3d 60, 64-66 (2d Cir. 2004). A confinement longer than an intermediate one, and under "normal SHU conditions" is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*." *Colon v. Howard*, 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305-day confinement). Shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest.

"SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions . . . or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer v. Richards*, 364 F.3d at 65 (citations omitted). In the absence of a detailed factual record, cases in this Circuit typically affirm dismissal of due process claims where the period of time spent in SHU was short–*e.g.*, 30 days–and there was no indication that the plaintiff endured unusual SHU conditions. *Id*. at 65-66 (collecting cases).

In *Arce v. Walker*, 139 F.3d 329, 334-35 (2d Cir. 1998), the Second Circuit made it clear that even though the prison condition at issue in *Sandin* was an inmate's challenge to his confinement in "disciplinary" segregation, the *Sandin* analysis is properly applied to determine whether non-punitive, "administrative" segregation implicates a state-created liberty interest. Once the court determines that a liberty interest exists, then the distinction between administrative and disciplinary segregation determines how much process is due. *See Wilkinson v. Austin*, 545 U.S. 209, 224-25 (2005) (when a liberty interest is established, the court turns to the question of what process is due an inmate because the requirements of due process are flexible depending on what the particular situation demands) (citing *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972); *Mathews v. Eldridge*, 424 U.S. 319 (1976)).

New York regulations governing Ad Seg provide that an inmate receive a hearing within fourteen days of entering Ad Seg. 7 N.Y.C.R.R. § 301.4(a). Once it is determined that Ad Seg is appropriate, the inmate's status must be reviewed every sixty days. *Id.* § 301.4(d). Inmates in Ad Seg are housed in the SHU and are subject to most of the same restrictions as inmates housed in SHU for disciplinary reasons. *See id.* § 301.4(c) (Ad Seg inmates will be subject to the same rules and regulations as those disciplinary inmates who have completed 30 days of satisfactory adjustment).

If it is determined that the inmate had a liberty interest in remaining free of Ad Seg, due process requires only that the inmate must receive some notice of the reasons for the placement and an opportunity to present his views to the prison official charged with deciding whether to transfer the inmate into Ad Seg. *Samms v. Fischer*, No. 9:0-

7

CV-349, 2011 WL 3876528, at *10 (N.D.N.Y. March 25, 2011) (Rep.-Rec.), *adopted by* 2011 WL 3876522 (N.D.N.Y. Aug. 31, 2011).[7] This opportunity to present his views need not be as formal as that required for disciplinary proceedings, rather, the officials must conduct an informal and non-adversary review of the information in support of the inmate's transfer into administrative custody. *Id.* (citations omitted).

B. **Application**

In my prior report in this action, I recommended denying the defendants' motion to dismiss the procedural due process claim. (Dkt. No. 22 at 13-15). In so doing, I found that plaintiff was in Ad Seg for more than 500 days,[8] long enough to establish a liberty interest under *Colon, supra*. *See also Fludd v. Fischer*, 568 F. App'x 70, 73 (2d Cir. 2014) (inmate's claim that spent two and a half years in continuous solitary confinement in Ad Seg established a liberty interest). Thus, this plaintiff would have been entitled to at least the minimum due process requirements for Ad Seg. In his amended complaint, plaintiff claimed that there was "no reason whatsoever" for his placement or his maintenance in Ad Seg. Further, he alleged that he was not allowed to submit "exhibits." (AC ¶¶ 6, 8). This court was unable to make the due process determination from the face of the complaint in view of plaintiff's allegations. (Dkt.

---

[7] The district court in *Samms* relied upon *Hewitt v. Helms*, 459 U.S. 460, 476 (1983), for this due process requirement. The court did note that although the *Hewitt* analysis for determining the existence of a liberty interest was overruled in *Sandin*, the *Hewitt* decision was still instructive in determining the appropriate level of procedural safeguards once a liberty interest is found. 2011 WL 3876528, at *10 n.4 (citing *Wilkinson v. Austin*, 545 U.S. at 229).

[8] In fact, it is clear from defendants' submission that plaintiff was in Ad Seg from December 29, 2009 until defendant Smith signed the release order on December 6, 2011. (Dkt. No. 19-3 at 2).

No. 22 at 15-16).

With his motion for summary judgment, defendant Smith has submitted a declaration, which outlines the reasons for plaintiff's Ad Seg placement and the procedures used by DOCCS in placing him there. (Smith Decl.) (Dkt. No. 48-1). Plaintiff was received by DOCCS on November 9, 2009. (Smith Decl. ¶ 8). Plaintiff is a former New York City police officer, who was convicted of third degree criminal sale of a controlled substance and first degree falsifying business records. (*Id.* & Ex. D (sentence & commitment)). Plaintiff was sentenced to one to three years confinement on August 19, 2009. (*Id.*)

While plaintiff was awaiting sentencing on the criminal sale and falsifying records charges, he was arrested for second degree murder and attempted second degree murder for shooting and killing his ex-girlfriend and for shooting and injuring another victim on March 9, 2009. (*Id.* ¶¶ 9, 10 & Ex. E). On December 21, 2009, DOCCS received a "lockdown order" for plaintiff, issued by the sentencing court. Attached to the lockdown order was the affirmation of Assistant Kings County District Attorney ("ADA") Michelle Kaminsky. (*Id.*) ADA Kaminsky's affirmation stated that at the time of his arrest on the murder charges, plaintiff had a piece of paper in his possession, entitled "Death Pool," with the names of the two victims on it, together with the names of other individuals. (*Id.* ¶ 11 & Ex. G).

Defendant Smith states that in order to ensure the safety of the individuals named on this list, the Kings County Supreme Court directed DOCCS to

> house plaintiff in a highly secured area in such a manner as to

> prevent him from communicating with or passing materials to other inmates, restrict plaintiff's visits and phone calls only to those individuals approved by the court, supervise all movements to and from plaintiff's cell and conduct a concurrent search of the plaintiff, and inspect each piece of plaintiff's outgoing and incoming mail.

(*Id.* ¶ 12 & Ex. E). The order specifically states that the court was presented with "clear and convincing evidence" that the plaintiff engaged in a course of conduct, raising "serious, well-founded and legitimate concerns that he poses a significant risk to the safety of the persons named on his list . . . ." (Def.'s Ex. E at 2).

When DOCCS received the court's order, the DOCCS Inspector General assigned Senior Investigator Sean Duncan to determine whether a recommendation should be made to place plaintiff in Ad Seg. (Smith Decl. ¶ 13). On December 29, 2009, plaintiff was transferred to Shawangunk and placed in Ad Seg in Shawangunk's SHU. (*Id.* ¶ 14). Plaintiff was served with a copy of Investigator Duncan's Ad Seg recommendation on the same day, setting forth the reasons for plaintiff's placement in Ad Seg. (*Id.* ¶ 15 & Ex. H). The recommendation also provides notice to the inmate that a "hearing will be conducted within 14 days of this recommendation," and that the inmate will be entitled to call witnesses, "providing that doing so does not jeopardize institutional safety or correctional goals." (Def.'s Ex. H at 3). The notice also states that if plaintiff was confined pending the hearing, he could write to the Deputy Superintendent of Security ("DSS") or his or her designee prior to the hearing "to make a statement on the need for continued confinement." (*Id.*)

The recommendation for Ad Seg was based in part on the order signed by the

judge, which included restrictions on a number of privileges. Investigator Duncan stated that plaintiff's presence in the general population of any facility was an "extreme risk to staff, inmates and the general public" in addition to the "safety, security and good order of the facility." (Smith Decl. ¶ 16). He therefore recommended Ad Seg placement. At the same time that plaintiff was served with Investigator Duncan's Ad Seg recommendation, plaintiff was offered the opportunity to have an employee assistant at the Ad Seg hearing, but plaintiff waived this right. (*Id.* ¶ 17 & Ex. I). Defendant Smith appointed DSS John Maly to conduct the Ad Seg hearing, which was conducted on December 31, 2009 and January 8, 2010. (*Id.* ¶¶ 18, 19). In addition to the audiotape mentioned above, defendants have filed a transcript of the Ad Seg hearing as Exhibit K. (*Id.* ¶ 19).

At the beginning of the Ad Seg hearing, DSS Maly explained exactly what kind of hearing he was conducting and what the issues would be. (Def.'s Ex. K at 3).[9] He made it clear that the hearing was for the purposes of Ad Seg, and there was no question of guilt or innocence because the only issue was whether plaintiff's presence in general population posed a danger. (*Id.*) DSS Maly explained to plaintiff that he would have the right to call witnesses, and plaintiff indicated that he understood. (*Id.* at 4). DSS Maly confirmed that plaintiff was served with the Ad Seg recommendation on December 29, 2009, and that plaintiff waived his right to employee assistance at the time. (*Id.*) DSS Maly read the Ad Seg recommendation into the record. (*Id.* at 6-8).

---

[9] The court will cite to the original pagination of the transcript, located at the bottom right-hand corner of the page.

11

DSS Maly then asked plaintiff whether he "agreed" with the recommendation, but advised plaintiff to state that he "disagreed" with it.[10] (*Id.* at 8). Plaintiff was again told that he had a right to call witnesses. (*Id.* at 15).

Plaintiff explained that he believed he was not a danger to staff, and that he would never give the officers a "hard time." (*Id.* at 10). Plaintiff stated that he "acted alone," and that the list was just something he wrote "after," "from a movie, that was all." (*Id.* at 15). The hearing was later adjourned in order to obtain Investigator Duncan's testimony. (*Id.* at 17-18). Investigator Duncan testified by telephone on January 8, 2010. (*Id.* at 18, 20-22). Plaintiff was afforded an opportunity to ask Investigator Duncan questions through DSS Maly, but ultimately plaintiff stated that he had no questions. (*Id.* at 22-25). Plaintiff then attempted to explain that he had been allowed to make telephone calls from other facilities without incident. (*Id.* at 25-26). Plaintiff and DSS Maly had a discussion about why plaintiff did not believe that he should be in Ad Seg and discussed the judge's lockdown order. (*Id.* at 25-29). DSS Maly asked plaintiff again if he wished to call any witnesses, and he declined.[11] DSS Maly asked plaintiff if he had any objections to closing the hearing, and plaintiff said "no objections." (*Id.* at 30).

When DSS Maly came back on the record, he read his disposition, finding that Ad Seg was appropriate. (*Id.* at 33-35). DSS Maly noted that based on the information

---

[10] DSS Maly explained that "disagreeing" with the recommendation would be akin to pleading "not guilty" in a "regular hearing." (Def.'s Ex. K at 10).

[11] Initially, plaintiff had mentioned that he might want to call his criminal attorney as a witness. (Def.'s Ex. K at 15).

12

presented, "it cannot be ascertained what assets and affiliations Inmate Bowens may currently have access to outside the prison system that might be able to assist him in victimizing the remainder of the persons on that list." (*Id.* at 34-35). DSS Maly then explained plaintiff's right to appeal the decision and gave him an appeal form. (*Id.* at 36-37).

During plaintiff's deposition in this case, defense counsel reviewed the Ad Seg hearing transcript with plaintiff. (Pl.'s Dep. at 50-82). Plaintiff conceded that DSS Maly allowed plaintiff to present any statement of defense or explanation of why he disagreed with the Ad Seg recommendation. (*Id.* at 53-54, 74). Plaintiff also agreed that his amended complaint alleges that DSS Maly refused to allow plaintiff to submit exhibits in order to prove that his placement in Ad Seg was "illegal." (*Id.* at 73). Although at his deposition, he initially testified that this claim was still "accurate," in the face of contrary documentary evidence, he ultimately stated that "I guess it's inaccurate now . . . ." (*Id.* at 74).

At his deposition, plaintiff testified that he disagreed with the Ad Seg determination, but conceded that he was given the opportunity to state his views, call witnesses, and offer exhibits. (*Id.* at 79). Plaintiff also conceded that he was told he had a right to appeal, and DSS Maly explained the appeal process. (*Id.* at 80-83). Although plaintiff stated that he did not remember receiving an appeal form, defense counsel refreshed plaintiff's memory with the appeal form that he signed after the Ad Seg hearing. (*Id.* at 83). The form is dated March 1, 2010, and it was sent to defendant

Smith.[12] (*Id.* at 83-84, Smith Decl. ¶ 47 & Ex. S). The date on the form shows that plaintiff did not appeal the Ad Seg hearing within 30 days. However, plaintiff explained that he did not appeal within thirty days because he "had good behavior . . . , [and he] figured they would remove me from Ad Seg." (*Id.* at 86-87). Finally, defense counsel showed plaintiff the 60-day Ad Seg "review" documents, dated before and after his guilty plea to murder and attempted murder on January 20, 2011. (*Id.* at 97-105).

Defendant Smith states in his declaration that he reviewed plaintiff's status after sixty days and determined that continued placement in Ad Seg was appropriate. (Smith Decl. ¶¶ 48-51). Although plaintiff attempted to file a grievance regarding his Ad Seg status, the grievance was denied because Ad Seg placement was beyond the purview of the grievance process. (*Id.* ¶ 56 & Ex. V, CM/ECF p.6). This determination was upheld on July 14, 2010. (*Id.* ¶ 60 & Ex. V, CM/ECF p.7). On April 1, 2010, Lucien Leclaire, Deputy Commissioner for Correctional Facilities, determined that plaintiff's case should receive "central office review." (*Id.* ¶ 61).

In February of 2011, plaintiff pled guilty to the murder and attempted murder charges. Plaintiff underwent ten sixty-day reviews, after which it was determined that none of the circumstances leading to the original determination had changed (*Id.* ¶¶ 62-120). Defendant has submitted all the accompanying documentation as exhibits to his declaration. On November 25, 2011, the Ad Seg Committee prepared another report, indicating that no new information had been received indicating that any of the original

---

[12] In his declaration, defendant Smith states that he reviewed DSS Maly's hearing determination on January 13, 2010 and found it to be "appropriate." (Smith Decl. ¶ 46 & Ex. R).

circumstances had changed. (*Id.* ¶ 121). However, on November 28, 2011, the Central Office Ad Seg Review Committee recommended consideration of a less restrictive environment due to plaintiff's "adjustment to confinement, problem-free history over the previous two years, and the lack of any recent indication of his seeking to harm others." (*Id.* ¶ 122 & Ex. ZZ). On December 6, 2011, Joseph Bellnier,[13] Deputy Commissioner for Correctional Facilities, determined that plaintiff should be released from Ad Seg. (*Id.*) On December 19, 2011, plaintiff was transferred to Clinton Correctional Facility.[14]

A review of all the documents submitted by defendant shows that plaintiff received all the process he was due prior to his Ad Seg placement and in connection with his periodic reviews, until the officials believed that he had shown sufficient adjustment, good behavior, and lack of any conduct indicating that he would harm others. Ad Seg only requires notice and an opportunity to be heard. Plaintiff received much more than the minimum requirements. He had a full Tier III hearing, and was afforded the opportunity to present evidence and question the witness. Plaintiff admitted at his deposition that his original claim that he was not afforded the opportunity to present evidence is "not accurate." Based upon his "Dead Pool" list, and

---

[13] Joseph Bellnier replaced Lucien Leclaire as the Deputy Commissioner for Correctional Facilities. (Smith Decl. ¶ 119 n.11). Kenneth Decker was the Acting Deputy Commissioner in the interim. (*Id.* & Ex. YY)

[14] At Clinton, plaintiff is confined to the Assessment Program and Preparation Unit ("APPU"), which houses "high profile, easily targeted, and/or victim-prone inmates." (Smith Decl. ¶ 129 & n.13). Defendant Smith states that APPU inmates have minimal exposure to the general population, they have all the privileges given to the general population, including programs and commissary. (*Id.*)

the state court's determination, ordering DOCCS officials to severely limit the plaintiff's access to the outside world, DOCCS conduct was not unreasonable. Thus, plaintiff's initial placement in Ad Seg fully comported with due process.

The periodic reviews of his confinement in Ad Seg were also appropriate. Plaintiff ultimately pled guilty to the murder and attempted murder charges in February of 2011. It was not unreasonable for DOCCS officials to continue his Ad Seg confinement until they were sure that he would not be a danger to others.[15] *See Fludd v. Fischer*, 568 F. App'x at 73 (vacating the district court's judgment dismissing due process claims with respect to the failure to conduct status reviews, while affirming the dismissal as to the claim that the status reviews that did occur failed to comport with due process).

## IV. <u>Free Exercise of Religion</u>

### A. **Legal Standards**

The First Amendment guarantees the right to the free exercise of religion. *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir. 2003) (citing *Pell v.*

---

[15] Defendant also argues that plaintiff did not exhaust his administrative remedies, that defendant Smith was not "personally involved" in any alleged due process violations and would be entitled to qualified immunity relative to the plaintiff's due process claim. Because this court has found no due process violation, it is unnecessary to determine the exhaustion issue, whether defendant was personally involved, or whether he would have been entitled to qualified immunity if a constitutional violation had occurred. However plaintiff did testify at his deposition that he "would not dispute" that he never filed a grievance, complaining about the denial of congregate services. (Def.'s Ex. A at 132-33). He essentially conceded his failure to exhaust as required by 42 U.S.C. §1997e(a).

*Procunier*, 417 U.S. 817, 822 (1974)). This right "is not absolute or unbridled, and is subject to valid penological concerns, including those relating to institutional security." *Johnson v. Guiffere,* 04-CV-57, 2007 WL 3046703, at *4, 2007 U.S. Dist. LEXIS 77239 (N.D.N.Y. Oct.17, 2007). However, the Second Circuit has also found that a prisoner's free exercise right is not extinguished by his confinement in SHU or keeplock. *Ford*, 352 F.3d at 597 (citing *Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993)). In order to limit this right, DOCCS must provide a legitimate penological interest. *See Turner v. Safely*, 482 U.S. 78, 89 (1987); *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987).

**B.     Application**

In this case, plaintiff alleges that for the entire time that he was in Ad Seg, he was denied the right to attend congregate religious services.[16] Prohibiting a particular inmate's attendance at congregate religious services because he is housed in Ad Seg does not violate the First Amendment *if the restriction serves a valid penological purpose*. *Graham v. Coughlin*, No. 86 Civ. 163, 2000 WL 1473723, at *6 (S.D.N.Y. Sept. 29, 2000) (citing *Bellamy v. McMickens*, 692 F. Supp. 205, 214-15 (S.D.N.Y. 1988)). Now that defendant has made a motion for summary judgment and the court is aware of the basis for plaintiff's placement in administrative segregation, his religion claim must fail. Aside from his Ad Seg status itself, it is clear why this plaintiff would

---

[16] As stated above, plaintiff has stipulated to discontinue his claim that he was denied access to a spiritual leader because he admitted at his deposition that he did have access to spiritual leaders. (Dkt. No. 45).

17

not have been allowed to attend congregate services.[17] Allowing him to attend services with other inmates would have been in direct violation of the court's lockdown order which stated that DOCCS officials were to prevent plaintiff from communicating with or passing information to other inmates. Attending congregate service would be the perfect opportunity to communicate with other inmates, which could have placed the individuals on plaintiff's list in danger. The prohibition of such attendance was related to security concerns and thus, clearly served a "valid penological purpose."

Although plaintiff has withdrawn his claim that he was denied access to a spiritual leader, it is worth noting that he testified during his deposition that when his father died, a member of the facility's ministerial staff (Imam Sham Saden) came to plaintiff's cell to assist him in making a telephone call to his mother. (Def.'s Ex. A at 118-19). Plaintiff also testified that during the time that he was in Ad Seg, he never submitted a written request for religious counseling as required by the SHU rules.[18] (*Id.* at 120-21). The rules require that members of the ministerial staff to make "a minimum of one round per week" in SHU. (*Id.*) (*See* Def.'s Ex. EEE, Rule Book at (IV)(XII)(2)). Plaintiff also testified that he did see and speak with some clergymen employed by

---

[17] Defendants also argue that prohibiting attendance at congregate services to all Ad Seg inmates serves a valid penological purpose. (Def.'s Mem. of Law at 17) (citing *Bellamy, supra*). This court need not determine whether denying all SHU or Ad Seg inmates access to congregate services serves a valid penological objective because it is clear that the prohibition regarding plaintiff served such a valid objective.

[18] Defendant Smith states that during the period that plaintiff was confined to Ad Seg, counseling by a member of the facility's ministerial staff was available by written request. (Smith Decl. ¶ 149, DOCCS Directive No. 4933, Def.'s Ex. EEE, Rule Book at (IV)(XII)(1)). The rules also specifically state that attendance at congregate services will not be permitted. (Def.'s Ex. EEE, Rule Book at (IV)(XII)(3)).

18

Shawangunk making rounds in his housing unit. (*Id.* at 121-22). Plaintiff testified that he spoke to a "Jewish guy" and a priest. (*Id.* at 122-23). Plaintiff ultimately testified that his complaint was written incorrectly, and that what he really meant to say was that if he were not in Ad Seg, he "would have [had] the opportunity to attend services with people of the same faith. That's what I actually meant." (*Id.* at 129). Summary judgment for defendant is, there for appropriate.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendant's motion for summary judgment (Dkt. No. 48) be **GRANTED** and the complaint **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: December 15, 2014

Hon. Andrew T. Baxter
U.S. Magistrate Judge